# United States Court of Appeals

## For the First Circuit

---

No. 08-1685

LAURIE CHADWICK,

Plaintiff, Appellant,

v.

WELLPOINT, INC.; ANTHEM HEALTH PLANS OF MAINE, INC.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Torruella and Stahl, Circuit Judges,
and García-Gregory,[*] District Judge.

---

David W. Webbert with whom Matthew S. Keegan and Johnson & Webbert, LLP, were on brief for appellant.
Margaret Coughlin LePage with whom Katharine I. Rand, William P. Saxe, and Pierce Atwood LLP were on brief for appellees.
Rae T. Vann and Norris, Tysse, Lampley & Lakis, LLP, on brief for amicus curiae Equal Employment Advisory Council.

---

March 26, 2009

---

[*]Of the District of Puerto Rico, sitting by designation.

**STAHL**, **Circuit Judge**.  Laurie Chadwick brought a claim of sex discrimination under Title VII, 42 U.S.C. §§ 2000e et seq., against WellPoint, Inc. and Anthem Health Plans of Maine, Inc. (collectively, "WellPoint"), after she was denied a promotion.[1]  She alleged that her employer failed to promote her because of a sex-based stereotype that women who are mothers, particularly of young children, neglect their jobs in favor of their presumed childcare responsibilities.  Having carefully reviewed the record, we are convinced that the district court erred in granting summary judgment in favor of WellPoint and therefore reverse and remand for further proceedings.  As to the second issue presented on appeal, we find that the district court did not abuse its discretion by excluding the expert testimony proffered by Chadwick.

## I. Background

It is elementary that at summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same.  See, e.g., Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004).  We emphasize this basic rule here because the district court's grant of summary judgment was due in part to a misapplication of this

---

[1]She also brought a parallel claim under the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634.

rule.  Thus, we relate the factual basis for Chadwick's claim against WellPoint with this dictate in mind.[2]

Chadwick was a long-time employee of WellPoint, an insurance company, in its Maine office.  She was hired by WellPoint in 1997, and was promoted in 1999 to the position of "Recovery Specialist II," which involved the pursuit of overpayment claims and claims for reimbursement from third parties.  In 2006, encouraged by her supervisor, she applied for a promotion to a management position entitled "Recovery Specialist Lead" or "Team Lead."  In this position, the successful candidate would be responsible for the recovery function for the region encompassing Maine, New Hampshire, and Connecticut.  Because Chadwick was already performing several of the responsibilities of the Team Lead position and based on her supervisor's comments, Chadwick believed she was the frontrunner for the position.  In addition, on her most recent performance evaluation in 2005, she had received excellent reviews, scoring a 4.40 out of a possible 5.00 points.

There were two finalists for the Team Lead position, Chadwick and another in-house candidate, Donna Ouelette.  While Chadwick had held the Recovery Specialist II position for seven

_____

[2]WellPoint contests several of the factual allegations and inferences put forth by Chadwick, but we must take Chadwick's well-supported version of events as true as we weigh the motion for summary judgment.  WellPoint may succeed in painting a different picture of the promotion decision for a jury, but that possibility does not impact our decision here.

years, Ouelette had only been promoted to that position about a year earlier. In addition, Ouelette had scored lower than Chadwick, though satisfactorily, on her most recent performance review, receiving a 3.84 out of a possible 5.0 points.

Three managers interviewed the two finalists: Linda Brink, who had previously supervised and worked closely with Chadwick; Dawn Leno, the Director of Recovery; and Nanci Miller, Chadwick's immediate supervisor. Nanci Miller was the ultimate decisionmaker for the promotion but she considered input from Brink and Leno in reaching her decision. Based on her own perceptions and those of Brink and Leno, Miller graded Ouelette's interview performance higher than Chadwick's. Miller subsequently offered the promotion to Ouelette over Chadwick.

At the time of the promotion decision, Chadwick was the mother of an eleven-year-old son and six-year-old triplets in kindergarten. There is no allegation, insinuation, or for that matter evidence that Chadwick's work performance was negatively impacted by any childcare responsibilities she may have had. Indeed, Miller, the decisionmaker, did not know that Chadwick was the mother of young triplets until shortly before the promotion decision was made. Apparently, Chadwick's husband, the primary caretaker for the children, stayed home with them during the day while Chadwick worked. He also worked off-hour shifts, presumably nights and weekends, when Chadwick was at home with the children.

During the same period, Chadwick was also taking one course a semester at the University of Southern Maine.

Chadwick alleges that WellPoint denied her the promotion based on the sex-based stereotype that mothers, particularly those with young children, neglect their work duties in favor of their presumed childcare obligations. To support this claim, Chadwick points to the fact that she was significantly more qualified[3] for the promotion than was Ouelette, and also highlights three statements made by management around the time of the promotion decision.

First, on May 9, 2006, two months before the decision was reached, Miller, the decisionmaker, found out that Chadwick had three six-year-old children (in addition to an eleven-year-old son). Miller sent an email to Chadwick stating, "Oh my -- I did not know you had triplets. Bless you!"

Second, during Chadwick's interview with Brink, her former supervisor, she was asked how she would respond if an associate did not complete a project on time. Unhappy with Chadwick's answer, Brink replied, "Laurie, you are a mother[.] [W]ould you let your kids off the hook that easy if they made a mess in [their] room[?] [W]ould you clean it or hold them accountable?"

_____

[3]It is a fair inference that Chadwick's qualifications significantly outweighed those of Ouelette. Whether a finder of fact would so conclude is a question for another day.

Third, and most important, when Miller informed Chadwick that she did not get the promotion, Miller explained:

> It was nothing you did or didn't do.  It was just that you're going to school, you have the kids and you just have a lot on your plate right now.

In the same conversation, Miller said that, "if [the three interviewers] were in your position, they would feel overwhelmed." Finally, Miller also told Chadwick that, "there would be something better down the road," and that Chadwick would look back and say "it's a good thing that that opportunity didn't work out because I'm happier with this down the road."

In her deposition, Miller said that she decided not to promote Chadwick because she interviewed poorly, and that she (Miller) only told Chadwick that she had "too much on her plate" in an ill-advised attempt to soften the blow.  In addition, in its brief, WellPoint makes much of its assertion that Ouelette was apparently the mother of two children, ages nine and fourteen. However, unlike the district court, we do not give weight to this assertion.[4]

---

[4]WellPoint's assertion that Ouelette was a mother of two does not receive weight in our assessment of the summary judgment motion for several reasons.  First, it is not at all clear that this is relevant for our analysis, as the Supreme Court has emphasized that "[t]he principal focus of [Title VII] is the protection of the individual employee, rather than the protection of the minority group as a whole."  Connecticut v. Teal, 457 U.S. 440, 453-54 (1982).  In other words, discrimination against one employee cannot be remedied solely by nondiscrimination against another employee in

Procedurally, WellPoint moved for summary judgment following discovery.  A magistrate judge recommended the motion be granted, and the district court, in a separate opinion, agreed. The district court concluded that Chadwick's claim could not proceed to a jury because "[n]othing in Miller's words show[ed] that" Chadwick was not promoted because of her sex, nor was there a "general atmosphere" of sex-based assumptions in the workplace. Chadwick v. WellPoint, Inc., 550 F. Supp. 2d 140, 147 (D. Me. 2008).  Chadwick now appeals.

## II. Discussion

**1. Summary Judgement Motion**

We review the district court's grant of summary judgment de novo.  Whitman v. Miles, 387 F.3d 68, 70 (1st Cir. 2004). Summary judgment is granted where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Importantly, as we explained above, we view

---

that same group.  See, e.g., Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).  Second, the record does not support the inference that WellPoint knew of Ouelette's status as a mother of two children, while it is uncontested that WellPoint knew of Chadwick's children.  Third, the stereotype that Chadwick complains of would arguably be more strongly held as to a mother of four children, three of whom were only six years old, than as to a mother of two older children.

-7-

the summary judgment record in the light most favorable to the nonmoving party, here Chadwick, and also draw all reasonable inferences in her favor. Flowers, 359 F.3d at 29.

### a. Legal Background

Title VII of the Civil Rights Act of 1964 prohibits discrimination based on sex. 42 U.S.C. § 2000e-2(a). Notably, the Act does not prohibit discrimination based on caregiving responsibility.[5] Chadwick's claim can be characterized as a "sex plus" claim. This denomination refers to the situation where "an employer classifies employees on the basis of sex plus another characteristic." 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 456 (3d ed. 1996) (emphasis in original). The terminology may be a bit misleading, however, because the "plus" does not mean that more than simple sex discrimination must be alleged; rather, it describes the case where "not all members of a disfavored class are discriminated against." Back v. Hastings on Hudson Union Free Sch. Dist., 36 F.3d 107, 118 (2d Cir. 2004). In other words, "[i]n such cases the employer does not discriminate against the class of men or women as a whole but rather treats differently a subclass of men or women." Lindemann, 456. Here, Chadwick alleges that the subclass being discriminated against based on sex is women with children, particularly young children.

---

[5]However, the Act does prohibit discrimination based on "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). These grounds are not at issue in this case.

Ultimately, regardless of the label given to the claim, the simple question posed by sex discrimination suits is whether the employer took an adverse employment action <u>at least in part</u> because of an employee's sex. <u>See</u> 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was <u>a</u> motivating factor for any employment practice, even though other factors also motivated the practice.") (emphasis added).

The type of discrimination Chadwick alleges involves stereotyping based on sex. The Supreme Court identified sex-based stereotyping as an impermissible form of discrimination in <u>Price Waterhouse</u>. There, a woman was denied partnership at the accounting firm for which she worked and was told by the partnership that she was too aggressive and macho, should attend a charm school, and should dress and behave more femininely. <u>Price Waterhouse</u> v. <u>Hopkins</u>, 490 U.S. 228, 235 (1989). The Supreme Court held that such remarks were evidence of sex-based stereotyping, which in turn suggested that sex discrimination was the cause of the failure to promote. <u>Id.</u> at 251. The Court pointedly said, "[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." <u>Id.</u>

The Supreme Court and several circuits, including this one, have had occasion to confirm that the assumption that a woman

will perform her job less well due to her presumed family obligations is a form of sex-stereotyping and that adverse job actions on that basis constitute sex discrimination. See Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 730 (2003); Back, 365 F.3d at 120 (identifying sex-stereotyping where employer stated that a woman could not "be a good mother" and work long hours, and that a woman "would not show the same level of commitment . . . because [she] had little ones at home"); Lust v. Sealy, Inc., 383 F.3d 580, 583 (7th Cir. 2004) (sex-stereotyping found where decisionmaker admitted he didn't promote plaintiff "because she had children and he didn't think she'd want to relocate her family, though she hadn't told him that"); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000) (finding proof of sex-based discriminatory animus where direct supervisor questioned "whether [the plaintiff] would be able to manage her work and family responsibilities"); Sheehan v. Donlen Corp., 173 F.3d 1039, 1045 (7th Cir. 1999) (in a Pregnancy Discrimination Act case, finding direct evidence of discrimination where supervisor told employee "that she was being fired so that she could 'spend more time at home with her children'" because statement "invoked widely understood stereotypes the meaning of which is hard to mistake").

In its 2003 decision in Hibbs, the Supreme Court took judicial notice of the stereotype that women, not men, are

-10-

responsible for family caregiving.  The Court noted that the Family Medical Leave Act (FMLA) was enacted by Congress because, "stereotype-based beliefs about the allocation of family duties remained firmly rooted [in society]."  Hibbs, 538 U.S. at 730.  The Court acknowledged the "pervasive sex-role stereotype that caring for family members is women's work."  Id. at 731.  It explained that Congress created the FMLA's gender-neutral twelve-week leave program in order to "attack the formerly state-sanctioned stereotype that only women are responsible for family caregiving, thereby reducing employers' incentives to engage in discrimination by basing hiring and promotion decisions on stereotypes."  Id. at 737.

In the simplest terms, these cases stand for the proposition that unlawful sex discrimination occurs when an employer takes an adverse job action on the assumption that a woman, because she is a woman, will neglect her job responsibilities in favor of her presumed childcare responsibilities.  It is undoubtedly true that if the work performance of a woman (or a man, for that matter) actually suffers due to childcare responsibilities (or due to any other personal obligation or interest), an employer is free to respond accordingly, at least without incurring liability under Title VII.  However, an employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family

-11-

responsibilities. The essence of Title VII in this context is that women have the right to prove their mettle in the work arena without the burden of stereotypes regarding whether they can fulfill their responsibilities.

### b. Chadwick's Claim

We turn now to the specific facts of Chadwick's claim, mindful that we are judging merely the claim's viability under summary judgment, rather than as to ultimate liability. Chadwick presses her claim under two separate, though related, theories. She puts forth a "mixed motives" claim, under Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003),[6] and a traditional discrimination claim under the familiar McDonnell Douglas burden shifting scheme.[7] Our decision here, however, is not dependent on analyzing Chadwick's claim under each of these theories,[8] because under both

---

[6]In Desert Palace, the Supreme Court concluded in light of the Civil Rights Act of 1991 that direct evidence of discrimination is not required in order to get a mixed-motives jury instruction. 539 U.S. at 101.

[7]Originally established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the framework requires a plaintiff to present a prima facie case of discrimination. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse job action. Finally, the plaintiff must prove that the proffered reason is actually a pretext and the true reason for the job action is discrimination. See, e.g., Santiago-Ramos, 217 F.3d at 54.

[8]The Desert Palace decision has proved ripe terrain for scholarly debate over how that decision interacts with the McDonnell Douglas framework. See, e.g., Jamie Darin Prenkert, "The Role of Second-Order Uniformity in Disparate Treatment Law: McDonnell Douglas's Longevity and the Mixed-Motives Mess," 45 Am.

approaches, "plaintiffs must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." Hillstrom, 354 F.3d at 31 (discussing the "interaction between Desert Palace and McDonnell Douglas").

In the opinion below, the district court acknowledged two important pieces of the puzzle. First, it found that sex-based stereotypes regarding women, families, and work are alive and well in our society. Chadwick, 550 F. Supp. 2d at 146. Second, it concluded that the statements made to Chadwick were based on "an assumption or generalization about the demands of continuing education coupled with child rearing responsibilities." Id. Yet the district court granted summary judgment to WellPoint because, as the court explained, Miller did not explicitly say that Chadwick's sex was the basis for her assumption that Chadwick would not be able to handle the demands of work and home. Id. at 147. The district court complained that the decisionmaker "[did] not refer explicitly to women," id. at 146, and that "nothing in Miller's words," id. at 147, showed that the decision was based on

Bus. L. J. 511, 512-15 (2008) (collecting commentaries). Suffice it to say that the two decisions have not been definitively disentangled or reconciled, though we have noted that "the Supreme Court used the McDonnell Douglas framework without commentary in a post-Desert Palace case." Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 n.3 (1st Cir. 2003).

-13-

"a stereotype about female caregivers, not about caregivers generally," id. Presumably, the district court was looking for Miller to say explicitly that she thought Chadwick would be overwhelmed because she is a woman with kids, rather than, as Miller actually said, "you have the kids." But this critique is not an adequate basis upon which to grant summary judgment in this case.

A plaintiff is entitled to prove discrimination by circumstantial evidence alone. See 42 U.S.C. § 2000e-2(m) (requiring a plaintiff merely to "demonstrate[]" that an employer used a forbidden consideration as a motivating factor with respect to an employment decision); Desert Palace, 539 U.S. at 98-99 (holding in the mixed-motives context that Title VII "does not mention, much less require, that a plaintiff make a heightened showing through direct evidence"); Thomas v. Eastman Kodak Co., 183 F.3d 38, 58 (1st Cir. 1999) (finding that under a direct evidence requirement, "the McDonnell Douglas / Burdine framework would no longer serve the purpose for which it was designed: allowing plaintiffs to prove discrimination by circumstantial evidence"). In Thomas, a case involving race discrimination, we rejected the district court's requirement that in order to survive summary judgment a plaintiff must allege "at least one piece of evidence that explicitly referred to the plaintiff's membership in a protected class." Id. at 57 (quoting Thomas v. Eastman Kodak Co.,

18 F. Supp. 2d. 129, 137 (D. Mass. 1998)). Instead, we concluded that "[t]here can be no rigid requirement that plaintiffs introduce a separate 'plus' factor, such as a negative employment comment about the plaintiff's protected class, in order to prove discrimination." Id. at 58.

We apply this same lesson to Chadwick's claim. We reject the district court's requirement that Miller's words explicitly indicate that Chadwick's sex was the basis for Miller's assumption about Chadwick's inability to balance work and home. To require such an explicit reference (presumably use of the phrase "because you are a woman," or something similar) to survive summary judgment would undermine the concept of proof by circumstantial evidence,[9] and would make it exceedingly difficult to prove most sex discrimination cases today. See id. at 58 n.12 (use of circumstantial proof of discrimination "is all the more important now than it was when McDonnell Douglas was written, since 'smoking gun' evidence is 'rarely found in today's sophisticated employment world'") (citing Hodgens v. General Dynamics Corp., 144 F.3d 151, 171 n.13 (1st Cir. 1998)).

---

[9]We note that circumstantial evidence is not necessarily less probative than direct evidence. See Desert Palace, 539 U.S. at 100 ("The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'") (quoting Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 508 n.17 (1957)).

-15-

Instead of adopting a "mechanical formula," as the district court below proposed, we conduct a "case-by-case analysis" and consider the individual facts of Chadwick's claim. Thomas, 183 F.3d at 58. Given what we know about societal stereotypes regarding working women with children, we conclude that a jury could reasonably determine that a sex-based stereotype was behind Miller's explanation to Chadwick that, "It was nothing you did or didn't do. It was just that you're going to school, you have the kids and you just have a lot on your plate right now." Particularly telling is Miller's comment that, "It was nothing you did or didn't do." After all, the essence of employment discrimination is penalizing a worker not for something she did but for something she simply is. A reasonable jury could infer from Miller's explanation that Chadwick wasn't denied the promotion because of her work performance or her interview performance but because Miller and others assumed that as a woman with four young children, Chadwick would not give her all to her job.

This inference is supported by several facts. First, the decisionmaker learned of Chadwick's three six-year-olds just two months before she denied Chadwick the promotion. The young age and unusually high number of children would have been more likely to draw the decisionmaker's attention and strengthen any sex-based concern she had that a woman with young children would be a poor worker.

Second, the decisionmaker's reaction upon learning of Chadwick's three small children was, "Bless you!"  This statement is susceptible to various interpretations, but a jury could reasonably conclude that Miller meant that she felt badly for Chadwick because her life must have been so difficult as the mother of three young children.[10]  This conclusion could be bolstered by Miller's later explanation to Chadwick that the WellPoint interviewers, all female, would feel "overwhelmed" if they were in Chadwick's position.

Third, because a plaintiff alleging discrimination infrequently has direct evidence of bias, the discrimination can "be proven through the elimination of other plausible non-discriminatory reasons until the most plausible reason remaining is discrimination."  Thomas, 183 F.3d at 61; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").  In Chadwick's case, Miller explained the non-promotion in one way to Chadwick (that she had too much on her plate with her kids and school) and

_____

[10]The district court erred by concluding that the "Bless you!" comment was conclusively "a friendly exclamation."  This is a factual conclusion that a judge at summary judgment is not free to make.  A jury could agree with Chadwick's view that Miller's comment suggested pity rather than respect.  Therefore, at summary judgment, we must draw this inference in Chadwick's favor.

-17-

in a very different way in her deposition (that Chadwick had performed poorly in her interviews). A jury could reasonably question the veracity of this second explanation given that Chadwick was an in-house, long-time employee who had worked closely with her interviewers, had received stellar performance reviews, and was already performing some of the key tasks of the Team Lead position. A jury could rightly question whether brief interviews[11] would actually trump Chadwick's apparently weighty qualifications, or whether, given the other circumstantial evidence discussed above, Chadwick was really passed over because of sex-based stereotypes.

In sum, we find that Chadwick has put forth sufficient evidence of discrimination that a reasonable jury could conclude that the promotion denial was more probably than not caused by discrimination. We do not opine on the ultimate balance of the evidence in this case. We only conclude that Chadwick has presented sufficient evidence of sex-based stereotyping to have her day in court. Given the common stereotype about the job performance of women with children and given the surrounding

---

[11]Defendants' brief makes much of its assertion that "it is undisputed that plaintiff did not perform well in her interviews." First, such a sweeping statement is not supported by the summary judgment record, viewed as it must be in the light most favorable to Chadwick. Second, at summary judgment we do not decide which explanation for the non-promotion is most convincing, but only whether Chadwick has presented sufficient evidence regarding her explanation. See Thomas, 183 F.3d at 61.

circumstantial evidence presented by Chadwick, we believe that a reasonable jury could find that WellPoint would not have denied a promotion to a similarly qualified man because he had "too much on his plate" and would be "overwhelmed" by the new job, given "the kids" and his schooling. See Hibbs, 538 U.S. at 736 ("Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men.").

**2. Expert Testimony**

Chadwick also appeals the district court's exclusion of her proffered expert testimony. Chadwick proposed testimony from Dr. Mary Still, a Ph.D. in Sociology and a post-doctoral research fellow at Cornell University, with expertise in employment discrimination and sex-based stereotypes in the workplace. In her deposition, Dr. Still offered her opinion on the prevalence and taxonomy of sex-stereotype employment discrimination. She also opined on how the comments and behaviors of the WellPoint supervisors were consistent with larger societal patterns and concluded that certain comments were likely based on sex stereotyping about the roles of men and women.

The district court excluded Dr. Still's testimony because "[t]he expert, whatever her professional credentials, is not competent to testify about what these supervisors meant, consciously or unconsciously, in using certain words." Chadwick, 550 F. Supp. 2d at 147 (emphasis in original).

-19-

Federal Rule of Evidence 702 makes admissible expert testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue." An expert witness "is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993). While we interpret Rule 702 "liberally in favor of the admission of expert testimony," Levin v. Dalva Bros., Inc., 459 F.3d 68, 78 (1st Cir. 2006), we also review a district court's ruling on admissibility of such testimony only for abuse of discretion, Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997). We do not find such abuse here.[12]

In effect, the district court believed that there was a mismatch between the expert's knowledge and qualifications and her ability to helpfully opine on the specifics of this case. See Levin, 459 F.3d at 78-79. The court below emphasized particularly that Dr. Still's apparent lack of familiarity with the details of

_____

[12]The exclusion of the expert testimony does not impact our conclusion on the summary judgment motion. We reached that decision without reliance on any testimony proposed by Dr. Still. See Back, 365 F.3d at 120 ("[I]t takes no special training to discern stereotyping in the view that a woman cannot 'be a good mother' and have a job that requires long hours.") (citing Price Waterhouse, 490 U.S. at 256 ("[I]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course in charm school.'")).

this case rendered her testimony unhelpful to a trier of fact.[13]
We find no abuse of discretion in this conclusion.[14]

### III. Conclusion

For the foregoing reasons, we **<u>REVERSE</u>** the entry of summary judgment, **<u>AFFIRM</u>** the exclusion of the expert testimony, and **<u>REMAND</u>** for further proceedings consistent with this opinion. Costs to the appellant.

---

[13]For example, the district court pointed out that the expert had not read Miller's deposition and was not familiar with Miller's background.

[14]Plaintiff, of course, is correct that sociological testimony of the sort offered here was taken into account by the Supreme Court in the landmark sex-stereotyping case <u>Price Waterhouse</u>. In that case, a social psychologist testified that "the partnership selection process at Price Waterhouse was likely influenced by sex stereotyping." 490 U.S. at 235. The expert offered her opinion on the likelihood that various partners' comments had been based on sex stereotypes, though she did not personally know the partners. The Court noted, "Fiske based her opinion on a review of the submitted comments, explaining that it was commonly accepted practice for social psychologists to reach this kind of conclusion without having met any of the people involved in the decisionmaking process." <u>Id.</u> at 236. In the instant case, we do not take the district court's exclusion of Dr. Still's testimony as a repudiation of the admissibility of all sociological expert testimony in this area of the law, which would seemingly run counter to the Supreme Court's view. Rather, we understand the district court to have concluded that Dr. Still could not offer information helpful to a trier of fact due to her particular lack of familiarity with the details of this case.